ROCKENBACH v. APOSTLE.

1. APPEAL AND ERROR—DE NOVO REVIEW—INJUNCTION.
    The Supreme Court reviews a suit to enjoin the establishment of a funeral home *de novo* on the record and in the light of the decisions of the Supreme Court.

2. NUISANCE—RESIDENTIAL DISTRICT—FUNERAL HOME.
    The presence of an apartment house or the rental of rooms or apartments does not change the use of land from being residential as regards matter of nuisance arising from the establishment of a funeral home nearby.

3. SAME—RESIDENTIAL DISTRICT—COMMERCIAL USE.
    The fact that business has reached a district does not establish that it has entered it so as to change the character of a residential area to a commercial one in determining whether or not a proposed use would constitute a nuisance.

4. SAME—FUNERAL HOME—MUNICIPAL ZONING ORDINANCE—PERMISSIVE USE—INJUNCTION.
    A municipal ordinance which allows the establishment or maintenance of a funeral home or undertaking establishment in a district zoned either for residential or commercial purposes is *permissive only and is not controlling as to* whether such an establishment would constitute a nuisance which might be enjoined by an equity court.

5. SAME—FUNERAL HOME—ZONING ORDINANCE—EVIDENCE.
    Proof of the existence of a zoning ordinance permitting the establishment or maintenance of a funeral home is admissible as evidence of the character of the district involved and bearing on the question of nuisance.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error, § 815.
[3] 39 Am Jur, Nuisances, § 44.
[7, 10] 54 Am Jur, Undertakers and Embalmers, §§ 7, 8.
[7, 8] Undertaker's establishment as nuisance. 23 ALR 745; 43 ALR 1171; 87 ALR 1061.
    Right to enjoin undertaking establishments as threatened or anticipated nuisance. 7 ALR 782; 26 ALR 953; 32 ALR 724; 55 ALR 890.

6. SAME—MUNICIPAL ORDINANCE.

  A nuisance will not be upheld solely on the ground that it has been permitted by municipal ordinance.

7. SAME—FUNERAL HOME IN RESIDENTIAL DISTRICT—GREAT WEIGHT OF EVIDENCE—DEPRESSIVE EFFECT ON VALUES.

  Plaintiffs in suit to enjoin, as a nuisance, the establishment of a funeral home upon lots in blocks otherwise devoted to residential use *held*, to have fully established by the great weight of the evidence that such a place would have a depressing influence upon them and deprive them of the comfort and repose to which they are entitled in their nearby residences and that property values for residential purposes would be substantially depressed.

8. SAME—FUNERAL HOME—DEPRESSING INFLUENCE—EVIDENCE.

  It requires no expert opinion to reach the conclusion that a funeral home, as a constant reminder of death, has a depressing influence upon most people in view of the presence of funerals, hearses, coffins, the keeping of dead bodies on the premises, the comings and goings of bereaved persons; it being unnecessary to show danger from disease or unpleasantness of odors arising from such business in order to enjoin it.

9. SAME—FUNERAL HOME—RESIDENTIAL DISTRICT—ZONING ORDINANCE—MENTAL PAIN AND SUFFERING.

  Emotions caused by the constant contemplation of death, arising from presence of a funeral home in the neighborhood, and mental pain and suffering, are elements of damage which may raise a bar to the establishment of a funeral home as a nuisance in a residential district even though the municipal zoning ordinance might permit it.

10. SAME—FUNERAL HOME—NUISANCE PER SE—RESIDENTIAL DISTRICT.

  A funeral home is not a nuisance per se as it is a lawful business, but when located in a residential district, it becomes subject to be abated as a nuisance to those whose residences are in the immediate proximity thereto.

Appeal from Muskegon; McDonald (Archie D.), J., presiding. Submitted April 10, 1951. (Docket No. 31, Calendar No. 45,058.) Decided May 14, 1951.

Bill by Frank P. Rockenbach and others against James Apostle and another to enjoin the establish-

ment, keeping and maintaining of a funeral home on their property. Decree for plaintiffs. Defendants appeal. Affirmed.

*Alexis J. Rogoski* and *Robert Bunker Rogoski*, for plaintiffs.

*Harold H. Smedley* and *William T. Caughey*, for defendants.

BOYLES, J. Plaintiffs filed the bill of complaint in this case to enjoin the defendants from establishing a funeral home and undertaking establishment on lots 7 and 8, block 94, of the city of Muskegon Heights. After issue was joined and the taking of testimony, the court granted the injunction and from the decree entered the defendants' appeal. We review the case *de novo,* based on the record, and in the light of the decisions of this Court.

Plaintiffs are residents and property owners in the vicinity of said lots 7 and 8, block 94. The defendants propose to change the dwelling now on lot 7 into a funeral home and undertaking establishment, and use lot 8 as an off-street parking lot in conjunction with the proposed funeral home. Block 94 and block 95 are on opposite sides of Peck street in the city of Muskegon Heights. Each block contains 24 lots, 12 lots in each block facing on Peck street. They are about a mile from the main business center of Muskegon Heights. Under a city zoning ordinance, Peck street south of blocks 94 and 95 is zoned commercial, while blocks 94 and 95 are zoned class "B" residential. The next 2 blocks north of blocks 94 and 95 are also zoned class "B" residential, except for 4 lots. Class "B" residential allows the operation of a funeral home upon consent of a five-sevenths vote of the city council. Defendants have obtained the required consent of the council, and have obtained

a permit for the alteration into a funeral home of the residence located on lot 7. Of said 12 lots in block 94, 9 are residences, 3 are vacant, 4 of said residences have apartments, 2 of them have rooms for rent to tourists. One of these homes was used by the owner for watch repair, and another in giving physiotherapy baths. There was no other use of the homes in block 94 which could be claimed to be for any business purposes. In block 95 there is a building at the rear of a dwelling where groceries are sold, with the adjacent lot used as a parking place.

Plaintiffs' bill of complaint alleges that the funeral home will cause a depreciation of property values, that unpleasant odors and contagious diseases will emanate from the funeral home, that the funeral home will cause a parking problem, that the presence of a funeral home will be a constant reminder of death and cause a general depressive feeling on the part of plaintiffs which will be injurious to their health and well-being, that the large crowds at the home and the coming and going of mourners will cause traffic and parking congestion so as to prevent the plaintiffs free ingress and egress to their respective properties. The defendants deny the allegations, and claim that the area is not a "strictly" residential area but is an area that is in a transition stage from residential to commercial, and that they have complied with the zoning ordinances. The lower court found that the neighborhood was strictly residential, that there would be no depreciation of property values, and no danger of disease or odors, but that the presence of a funeral home would be depressive and thus be injurious to the plaintiffs' well-being and health.

The questions of fact for consideration are whether lots 7 and 8, block 94, are in a residential district within the meaning of our decisions, whether plaintiffs have shown that the establishment and maintenance of the funeral home and undertaking establish-

ment on said lots 7 and 8 would have a depressive influence upon the residents of that area, and whether it would substantially depreciate the value of their property. Under our decisions, an affirmative answer to these questions would affirm the decree.

The homes in blocks 94 and 95 are used solely for residential purposes with only one exception of any importance—the grocery store at the rear of a house in block 95. One of defendants' claims in support of their position is that lots 7 and 8, block 94, are not located in a "strictly" residential district, because some of the homes are used as multiple dwellings, apartments for rent, or rooms rented to tourists. The only outward visible evidence of such use consists in approximately 3 small signs, "Tourist rooms," in front of obviously fine residences. The fact remains that these homes are still used for residential purposes. The presence of an apartment house or the rental of rooms or apartments does not change such use from being residential. *Saier* v. *Joy,* 198 Mich 295 (LRA1918A 825) ; *Dillon* v. *Moran,* 237 Mich 130. Defendants also rely on evidence that an owner of one otherwise fine residence makes use of his home to repair watches, and another such owner makes use of his home to give "physiotherapy" baths. Defendants rely also on the fact that in block 95, across the street from block 94, there is a grocery store at the rear of a residence and a place for parking.

The photographic exhibits and the testimony of many witnesses show that block 94 definitely is a residential district, with attractive modern residences. This is true as to the entire block, and particularly as to the homes north and south on Peck street adjoining defendants' lots 7 and 8. Defendants also rely on the claim that the blocks on Peck street south of block 94 are now commercial. However,

"The question for decision is not what is the condition of districts north or south or east or west of this district, but what is the character of the particular district involved. The fact that business has reached the district does not establish that it has entered it. The testimony and the photographs introduced in evidence are convincing that the district is a strictly residential district. There are many substantial homes, some single dwellings, some duplexes and some apartments; a few roomers are taken, and some of the places are rented, although in the main the homes are occupied by their owners. The particular district here involved has retained its residential character although outside of it in some directions business has crept in and become the predominant factor." *Dillon* v. *Moran, supra.*

This case presents one circumstance which apparently has not been before the Court for consideration, in determining whether an undertaking establishment may be maintained in a district claimed to be residential. A zoning ordinance of Muskegon Heights classifying block 94 as "B" residential and defining the use which might be made of lots in that block, permits funeral homes, provided that consent of five-sevenths of the council be obtained and that certain off-street parking be provided. It is conceded that the defendants have obtained the requisite consent of the council, and have made the necessary provisions for off-street parking. The precise question is, what bearing does this have upon the outcome of a case where the residents of this district seek to enjoin the use of lots in block 94 for a funeral home, on the ground of nuisance? Decisions from other jurisdictions involving undertaking establishments permitted by zoning ordinances in residential districts are at such variance as to facts and circumstances that none can be said to be squarely in point. Nor are such cases in agreement as to the law. *Sweet* v. *Campbell,* 282 NY 146 (25

NE2d 963); *Kirk* v. *Mabis*, 215 Iowa 769 (246 NW 759, 87 ALR 1055); *Linsler* v. *Booth Undertaking Co.*, 120 Wash 177 (206 P 976); *State, ex rel. Stephens,* v. *City of Jacksonville,* 103 Fla 177 (137 So 149); *White* v. *Luquire Funeral Home,* 221 Ala 440 (129 So 84).

The weight of authority is to the effect that an ordinance which allows the establishment or maintenance of a funeral home or undertaking establishment in a district zoned either for residential or commercial purposes is permissive only, and not controlling as to whether such undertaking establishment would constitute a nuisance which might be enjoined by an equity court. However, proof of the existence of such a zoning ordinance is admissible as evidence of the character of the district, and bearing on the question of nuisance. A nuisance will not be upheld solely on the ground that it has been permitted by municipal ordinance. *Sweet* v. *Campbell, supra; Williams* v. *Blue Bird Laundry Co.,* 85 Cal App 388 (259 P 484); *Fendley* v. *City of Anaheim,* 110 Cal App 731 (294 P 769); *Kosich* v. *Poultrymen's Service Corp.,* 136 NJ Eq 571 (43 A2d 15); *Perrin's Appeal,* 305 Pa 42 (156 A 305; 79 ALR 912); *White* v. *Old York Road Country Club,* 318 Pa 346 (178 A 3).

The great weight of the evidence shows that plaintiffs have fully established the fact that the undertaking establishment would have a depressing influence upon them, if located on lots 7 and 8, block 94. Various witnesses testified as follows:

"It would be very depressing, because of the funeral being gathered there and knowing bodies were being brought there. The music of the funeral would be depressing."

"A funeral home in a residential district such as this is very depressing. Funerals being in session

you hear the funeral dirges, possibly the sermon and all the funeral activities going on right in the center of the block."

"I object to a funeral home being located at this site for it is depressing. It had been a convalescent home and they carried dead bodies out and it was depressing, and cars parked there. The location of a funeral home at that site would be more depressing."

"Every time you see a body you think of yourself, pretty soon you got to die too and they carry you in and out too. The presence of hearses and funeral cars would have the same effect on me."

"I would say the presence of a funeral home would have a tendency to depress some individuals to live in the proximity of a funeral home; more likely on people as they grow older. I think it might have an adverse effect on young teen-agers, young children."

"I lived very near a funeral home a number of years and it is not pleasant and there is too much going and coming and too many cars being parked. That is all I have. When you get as old as I am you are thinking soon it will be your turn."

"Our house adjoins the proposed funeral home immediately to the north. There is about 20 feet between the houses.

"I object to the location of a funeral home at that site for to me the constant presence of death is depressing. I have an idea it might be harmful to my health at some time. I am not an authority on the subject, but I think it could be possible. It is not the thing I want next to my home."

To the contrary, 3 funeral directors testified for the defendants, that an undertaking establishment had no depressing influence upon them, or upon others so far as they knew. Two or 3 other witnesses for the defendants also testified to the same effect,

as to their own reaction to a funeral home and an undertaking business.

We agree with the trial court the plaintiffs have established by the great weight of the evidence that the presence of the undertaking establishment would be a constant reminder of death, depressing in its influence upon the plaintiffs, and would deprive them of the comfort and repose to which they are entitled.

We are also of the opinion that plaintiffs have shown by the great weight of the evidence that property values would be substantially depressed for residential purposes by the proposed establishment of the funeral home. Four of the plaintiffs testified:

"It would destroy the value of my home.

"I am a real estate broker. At one time I was mayor of Muskegon Heights. I am familiar with business property and real estate values. I am of the opinion the location of a funeral home on the proposed site would depreciate the value of my property for residence purposes from 10 to 20 per cent., maybe 25 per cent. I think it would depreciate it for business purposes, for not many people are going to establish a business alongside of a funeral home. * * *

"My opinion of the present value of my house and lot is $17,000. Its reduced value would be around $14,000."

"I feel the location of the funeral home at that point would affect the market value of the property owned by myself and my wife."

"I am sure it depreciates the value of my property."

"I certainly object to a funeral home being placed there. It depreciates our property and at our age we can't afford to have our property depreciated."

Another witness testified:

"I am a realtor in the city of Muskegon. I have been engaged in the real estate business 25–26 years. I live in the city of Muskegon Heights. I deal in both commercial and residential property. I am a member of the American Institute of Real Estate Appraisers by qualification and hold a certificate designated M. A. I. I have had a very extensive operation in both Muskegon and Muskegon Heights in selling and leasing commercial property; involving the sale and leasing of the largest buildings. I am familiar with the proposed site for the funeral home.

"I am of the opinion that the location of a funeral home at that site would depress the market value of residential property in the same block very extensively, on both sides of the street."

To the contrary, the city assessor testified:

"If a funeral home became a reality on lot 7, block 94, I do not believe the adjoining property in block 94 and across the street, block 95, would deteriorate the value. It probably wouldn't in a commercial way. It might to some people. The vacant property might even enhance in value coming more close to the period of commercializing them."

Another witness, engaged in the real estate business, testified as to values:

"I would say that it has reached its highest value and is now on a downgrade trend as far as residential use. * * * The lots have a very limited value if the demand is restricted to residential purposes. The value would undoubtedly be higher if it was considered as an investment for future commercial use. * * * If a structure or business enters into a residential district that is undesirable. It will depress the market value of the real estate for real estate purposes, if in residential areas."

Another witness, in the real estate business, testified:

"As to the value of lots (blocks) 94 and 95 for residential purposes, they have value from a standpoint of an apartment house, hotel development or multiple dwellings, but very little value from the standpoint of a single residence."

We note that the defendants' proofs point more particularly to the value of the property for commercial purposes. The evidence predominates that the value of the houses would be substantially depreciated for use as homes.

The leading case in this State is *Saier* v. *Joy* (198 Mich 295), *supra*. Plaintiffs owned and operated a 6-apartment house on Townsend street in Lansing, approximately 1 1/2 blocks south of the State Capitol grounds. This property, with that owned by other plaintiffs, was valuable for use by tenants and roomers due to its nearness to the State Capitol. The defendants purchased the Lantz property adjacent to that owned by Mr. and Mrs. Saier, to use in their business, as an undertaking establishment. In granting an injunction restraining the defendants from establishing such a business in the proposed location, the Court said:

"We are satisfied from the evidence in the case that the value of the plaintiffs' property would be materially decreased by the maintenance of defendants' business at the Lantz property.  *  *  *  We think it requires no deep research in psychology to reach the conclusion that a constant reminder of death has a depressing influence upon the normal person. Cheerful surroundings are conducive to recovery for one suffering from disease, and cheerful surroundings are conducive to the maintenance of vigorous health in the normal person. Mental depression, horror, and dread lower the vitality, rendering one more susceptible to disease, and re-

duce the power of resistance. There is an abundance
of testimony in this record confirmatory of this, and
it is a matter of common knowledge. The constant
going and coming of the hearse (defendants in 11
months had 269 funerals); the not infrequent taking
in and out of dead bodies; the occasional funeral
with its mourners and funeral airs, held in the part
of the house designed for a chapel; the unknown
dead in the morgue, and the visits of relatives seek-
ing to identify them; the thought of autopsies, of
embalming; the dread, or horror, or thought, that
the dead are or may be lying in the house next door,
a morgue; the dread of communicable disease, not
well founded, as we have seen, but nevertheless pres-
ent in the mind of the normal layman—all of these
are conducive to depression of the normal person;
each of these is a constant reminder of mortality.
These constant reminders, this depression of mind,
deprive the home of that comfort and repose to which
its owner is entitled."

Defendants make much use of the claim that in the
*Saier Case, supra,* the Court found the proposed
location of the establishment to be in a "strictly"
residential district. The same designation was used
in *Kundinger* v. *Bagnasco,* 298 Mich 15, although a
florists' delivery office was located in the residential
district. The basis for the holding in the *Saier Case,*
as well as in the *Kundinger Case,* may be found in
the concluding sentence in the latter opinion. The
Court said:

"It requires no expert opinion to reach the conclu-
sion that a funeral establishment, as a constant re-
minder of death, has a depressing influence upon
most people. Funerals, hearses, coffins, the keeping
of dead bodies on the premises, the comings and go-
ings of bereaved persons, are conducive to depres-
sion and sorrow and deprive a home of the comfort
and repose to which its owners are entitled. It is
not necessary to show danger from disease or un-

pleasantness of odors arising from the maintenance of such a business in order to enjoin it. *Arthur* v. *Virkler*, 144 Misc 483 (258 NYS 886); *Williams* v. *Montgomery*, 184 Miss 547 (186 So 302). Emotions caused by the constant contemplation of death, as well as the realization that the bodies of deceased persons are often, if not continuously, on such premises as those here in question, are more acute in their painfulness, in many cases, than suffering perceived through the senses; and mental pain and suffering are elements of damage, in the eyes of the law. Where there can be said to be a long-established residential district, such as in this case, the intrusion of the funeral business therein will be restrained as a nuisance by injunction. See *Saier* v. *Joy*, 198 Mich 295 (LRA1918A 825); *Dillon* v. *Moran*, 237 Mich 130."

Counsel for both parties refer at length to decisions from other jurisdictions. The variance in such cases, both as to the facts and circumstances, as well as the conclusions of law, leads to different results. However, as to funeral establishments, the weight of authority was discussed in an opinion, citing many cases, by the supreme court of Alabama,[*] and decided on that question in consonance with the holding of this Court in the *Saier* and *Kundinger Cases*, *supra*. The Alabama court said:

"As frequently declared by this court, a funeral home is not a nuisance per se in that sense. It is a lawful business, one quite essential to meet modern needs in many ways.

"But it must be regarded as settled in this jurisdiction that a funeral home located in a distinctly residence district may be and often becomes subject to be abated as a nuisance to those whose residences are in immediate proximity thereto. * * *

---

[*] *White* v. *Luquire Funeral Home*, 221 Ala 440 (129 So 84), *supra*.

"The siren of the ambulance on emergency calls, with possible outcries of grief-stricken friends, are sounds which may reach such residents.

"More serious are the hurts that come through the sense of sight. The hearse, the ambulance, the morgue, are reminders of the presence of the dead; the funeral procession and service with all the incidents of grief-stricken relatives forced upon frequent attention of those entitled to the quiet, peace, and happiness of the home, bring depression and discomfort to the normal person unschooled to such conditions.

"Such discomfort cannot be regarded as fanciful, imaginative, nor due to oversensitiveness. Conditions, inherent in the business, bring such an atmosphere about the place as to render it less desirable as a place of residence, and if less desirable the property becomes less valuable for residence purposes. Some cases have enlarged greatly upon these considerations. We merely add that this court has followed the line of cases declaring the funeral home, in the nature of it, may become and often does become a nuisance when located in close proximity to residences which are themselves located in a district devoted to residence purposes. *Laughlin, Wood & Co.* v. *Cooney,* 220 Ala 556 (126 So 864); *Higgins* v. *Bloch,* 213 Ala 209 (104 So 429); *Higgins & Courtney* v. *Bloch,* 216 Ala 153 (112 So 739); *Bloch* v. *McCown,* 219 Ala 656 (123 So 213); *Gillette* v. *Tyson,* 219 Ala 511 (122 So 830); *Nevins* v. *McGavock,* 214 Ala 93 (106 So 597); *Blackburn* v. *Bishop* (Tex Civ App), 299 SW 264, 265; *Tureman* v. *Ketterlin,* 304 Mo 221 (263 SW 202, 43 ALR 1155); note 43 ALR 1171; *Saier* v. *Joy,* 198 Mich 295 (LRA1918A 825); *Jordan* v. *Nesmith,* 132 Okla 226 (269 P 1096); *Dillon* v. *Moran,* 237 Mich 130; *Beisel* v. *Crosby,* 104 Neb 643 (178 NW 272); *Densmore* v. *Evergreen Camp No. 147, Woodmen of the World,* 61 Wash 230 (112 P 255, 31 LRA NS 608, Ann Cas 1912B 1206); *Cunningham* v. *Miller,* 178 Wis 22 (189 NW 531, 23 ALR 739, and note); *Street* v. *Marshall,* 316 Mo 698 (291 SW 494);

*King* v. *Guerra* (Tex Civ App), 1 SW2d 373; *Bragg* v. *Ives,* 149 Va 482 (140 SE 656); *Meldahl* v. *Holberg,* 55 ND 523 (214 NW 802); *Harris* v. *Sutton,* 168 Ga 565 (148 SE 403)."

The evidence in this case would not support a finding that the establishment proposed by the defendants will in its operation become a nuisance by reason of noises, odors, fumes, flies, or dissemination of disease. In fact, plaintiffs have abandoned such claims, and there is no probative value in any testimony to show that a parking problem or traffic congestion will necessarily arise. For those reasons, cases wherein we have declined to enjoin the *use* of property on the ground that it might become a nuisance by use are not in point. See, for examples, *City of Lansing* v. *Eaton Circuit Judge,* 214 Mich 117; *Lansing* v. *Perry,* 216 Mich 23; *Briggs* v. *City of Grand Rapids,* 261 Mich 11; *Sommers* v. *City of Detroit,* 284 Mich 67; *Warren Township School District No. 7, Macomb County,* v. *City of Detroit,* 308 Mich 460 (1 Av 1162); *Gableman* v. *Department of Conservation,* 309 Mich 416; *Village of St. Clair Shores* v. *Village of Grosse Pointe Woods,* 319 Mich 372; *Foster* v. *County of Genesee,* 329 Mich 665.

The trial court correctly concluded that the plaintiffs are entitled to an injunction restraining the establishment and maintenance of an undertaking establishment by the defendants on the property in question.

Affirmed. Costs to appellees.

Reid, C. J., and North, Dethmers, Butzel, Carr, Bushnell, and Sharpe, JJ., concurred.